UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

———————————————————

REGIONAL LOGISTICS GROUP, LLC,

      Plaintiff,

   v.                                                21-CV-347-LJV
                                                        DECISION & ORDER

WEST AMERICAN INSURANCE
COMPANY,

      Defendant.

———————————————————

On January 26, 2021, Regional Logistics Group, LLC ("Regional"), commenced

this declaratory judgment action against West American Insurance Company ("WAIC")

in New York State Supreme Court, Erie County.  Docket Item 1-1 (complaint and

attached exhibits "1"-"20").  Regional seeks a judgment declaring that WAIC is obligated

to defend and indemnify it under the terms of a Commercial Inland Marine insurance

policy issued to Regional by Liberty Mutual Company ("Liberty Mutual") through its third-

party underwriter, WAIC.  *Id.*  WAIC removed the action to this Court on March 4, 2021,

Docket Item 1, and answered the complaint a week later.  Docket Item 2.

Regional moved for summary judgment, Docket Item 8, and WAIC cross-moved

for dismissal under Federal Rule of Civil Procedure 12(c), Docket Item 9.  Each party

then responded to the other's motion and replied in support of its own motion, Docket

Items 11, 12, 20, and 21.  This Court heard oral argument on November 8, 2022,

Docket Item 23.  At the close of oral argument, the Court asked for additional

submissions, and those submissions were filed on November 28, 2022.  Docket Items

24 and 25.

For the reasons that follow, Regional's motion for summary judgment, Docket Item 8, is granted, and WAIC's motion to dismiss, Docket Item 9, is denied.

## FACTS[1]

**Background**

Ascion, LLC d/b/a Reverie ("Reverie"), is a manufacturer and retailer of mattresses, adjustable foundations, and other bedding accessories.  Docket Item 1-1 at 25, ¶ 1.  In March 2016, Reverie entered into a Warehouse Service Agreement (the "Warehouse Agreement") with Regional, a warehousing and transportation company.  Docket Item 8-4 at ¶ 3; Docket Item 1-1 at 76-92.  Under the Warehouse Agreement, Regional agreed to store and transport "adjustable foundations and other bedding accessories" from its warehouse to Reverie's customers.  Docket Item 8-4 at ¶ 4.  Upon timely and successful storage and transport of the products, Reverie agreed to remit payment for that storage within 45 days of receipt of the invoice.  *Id*. at ¶ 5.

According to Regional, the Warehouse Agreement required Reverie to provide appropriate pallets, boxing, and labels so that Regional could ship Reverie's products.  Docket Item 1-1 at 7, ¶ 18.  Regional maintains that from 2016 through 2017, Reverie provided "adequate pallets, boxes[,] and labels."  *Id*. at ¶ 19.  Regional says that beginning in 2017, however, Reverie began shipping its products to Regional on a

---

[1] On a motion for summary judgment, the court construes the facts in the light most favorable to the non-moving party. *See Collazo v. Pagano*, 656 F.3d 131, 134 (2d Cir. 2011). The following facts are taken from the complaint, Docket Item 1-1, Regional's statement of material facts, Docket Item 8-4; the defendant's response to Regional's statement of material facts, Docket Item 12; and the exhibits incorporated in those filings.  Most facts are not disputed; any disputed facts are construed in the light most favorable to WAIC.

"much cheaper and lesser quality pallet." *Id*. at ¶ 20. According to Regional, although it shared its concerns about the quality of the pallets and the consequent risk of damage with Reverie, Reverie did not heed its advice. *Id*. at ¶¶ 21-22.

Consistent with its standard practice, Regional invited Reverie to "inventory/cycle count" its products once they reached Regional's warehouse and afterward upon request. Docket Item 8-4 at ¶ 7. In fact, Reverie performed numerous inventory/cycle counts at Regional's warehouse during their four-year business relationship, including on March 31, 2019. *Id*. at ¶ 8. Reverie maintains that its inspection on March 31, 2019, revealed significant damage to its products stored at Regional's warehouse. Docket Item 8-4 at ¶ 9; *see also* Docket Item 1-1 at 23-72. Regional disputes Reverie's claims of damage, asserting that only the outer packaging sustained "slight damage" and that "[n]one of the actual [p]roduct[s] contained within the packaging was damaged." Docket Item 8-4 at ¶¶ 10-11.

Sometime after the March 2019 inspection, Reverie refused to remit payment for services provided by Regional under the Warehouse Agreement. *Id*. at ¶ 18. In December 2019, Regional audited its books and records and determined that "as of December 17, 2019, Reverie's past due balance was $90,000." *Id*. at ¶ 19. Regional then unilaterally terminated the Warehouse Agreement. *Id*. at ¶ 21. As of January 1, 2020, Regional calculated that the "costs associated with Reverie's account" were $227,192.77. *Id*. at ¶ 24.

**The Underlying Action**

On January 3, 2020, Reverie commenced an action against Regional in New York State Supreme Court, Erie County (the "Underlying Action"). *Id*. at ¶ 25; *see also*

3

Docket Item 1-1 at 25-72 (complaint in Underlying Action with exhibits).  In the Underlying Action, Reverie seeks damages for breach of contract, negligence, conversion, tortious interference with business advantage, and unjust enrichment in connection with the products stored at Regional's warehouse.  Docket Item 1-1 at 25-72.  Reverie also asked for a permanent injunction, and it brought an order to show cause seeking the immediate return of its products.  *Id*. at 73-74.  Two weeks later, Reverie and Regional agreed to "work[] cooperatively to allow Reverie to remove its [p]roduct[s] from Regional's warehouse" in exchange for payment to Regional in the amount of $104,300.00.  *Id*. at 9-10, ¶¶ 34-35; *see also* Docket Item 1-1 at 103-106 ("Forbearance Agreement").

Reverie and Regional argued the order to show cause on February 14, 2020.  Docket Item 1-1 at 11, ¶ 41; Docket Item 1-1 at 113-116 (transcript of February 14, 2020 oral argument).  Because of the possibility of insurance coverage, Docket Item 1-1 at 114, and the fact that Regional had filed an insurance claim, *id.,* discovery was stayed.  *Id*. at 115.  Acting New York State Supreme Court Justice Timothy J. Walker instructed the parties to "work with the insurance company to ascertain whether there is coverage for the claim, [and] to assist the claims folks in the analysis of the amount of damages."  *Id*. at 114.

Regional answered the complaint in the Underlying Action on May 7, 2020, asserting counterclaims against Reverie for breach of contract, account stated, and unjust enrichment.  *Id*. at 121-138.  Reverie answered Regional's counterclaims on August 17, 2020.  Docket Item 1-1 at 303-312.  The Underlying Action remains stayed pending the outcome of this action.

### The Insurance Coverage

For the period October 29, 2019, to October 29, 2020, Liberty Mutual, through its

third-party underwriter, WAIC, issued a Commercial Inland Marine insurance policy to

Regional (the "Policy).  Docket Item 1-1 at 223-298.  The Policy includes Warehouse

Legal Liability Coverage Form Number IM 76 50 04 04, which provides as follows:

> **COVERAGE**
> 1. **Legal Liability Coverage** -- "We" cover "your" legal liability for loss to covered property:
>     a. while under "your" care, custody, and control; and
>     b. that "you" become legally obligated to pay as a warehouse operator under a "warehouse receipt" issued by "you".
> 2. **We Do Not Cover** -- "We" do not pay for costs, expenses, fees, fines, penalties, or damages resulting from "your" violation of any law or regulation relating to any delay in payment, denial, or settlement of any claim.
>
> **PROPERTY COVERED**
> "We" cover the following property unless the property is excluded or subject to limitations.
> 1. **Coverage** -- "We" cover direct physical loss caused by a covered peril to property of others that "you" store at "your" warehouse.
> 2. **Coverage Limitations** -- "We" only cover property of others:
>     a. while in storage in a warehouse building that is described on the "schedule of coverages" or within 100 feet of the described warehouse building; and
>     b. that is described in "your" "warehouse receipt".

Docket Item 1-1 at 283.  The Policy also includes certain coverage extensions, including

for defense costs:

> **COVERAGE EXTENSIONS**
> 2. **Defense Costs** --
>     a. **Coverage** -- "We" have the option to defend any "suit" brought against "you" as a result of damage to covered property caused by a covered loss.  "We" may investigate and settle a claim or "suit".
>     b. **Coverage Limitation** -- "We" do not have to provide a defense after "we" have paid the "limit" as a result of a judgment or written statement.

      c. **You Must Not** -- "You" must not:
         1) admit liability for a loss, settle a claim, or incur any expense without "our" written consent; or
         2) interfere with "our" negotiation for a settlement.
      d. **Covered Expenses** – "We" will pay the following expenses associated with any "suit" "we" defend:
         1) expenses that "we" incur while investigating and defending the "suit";
         2) actual loss of "your" salary, up to $250 per day, for "your" time spent away from work at "our" request;
         3) expenses that "you" incur at "our" request;
         4) all costs that "you" are required to pay as a result of any "suit" "we" defend;
         5) interest that accrues after entry of a judgment, until "we" tender, deposit in court, or pay "our" part of the judgment;
         6) interest that is awarded against "you" before the entry of judgment.  If "we" make an offer to settle the "suit", "we" will not pay any interest that accrues after the offer to settle; and
         7) cost of a bond for the release of attachments.  "We" are not required to furnish a bond itself.

Docket Item 1-1 at 285.

**The Coverage Dispute**

Regional maintains that it had been in communication with WAIC about Reverie's claim "from the beginning" and formally put WAIC on notice of the Underlying Action by email dated January 27, 2020.  Docket Item 1-1 at 108-109.  WAIC acknowledged Regional's email the following day, Docket Item 1-1 at 111, and, according to Regional, "did not object to Regional's retained counsel, oppose the pending [order to show cause], or otherwise express concern regarding the Underlying Action."  Docket Item 8-4 at ¶ 32.  WAIC did not appear at the February 14, 2020 oral argument on the order to show cause, "nor did it object or seek a continuance despite receiving notice that [Regional's] interests were implicated both in the Underlying Action and the specific matter brought on by Reverie's [order to show cause]."  *Id.* at ¶ 34.

6

In the meantime, in January 2020, Regional and Reverie negotiated the removal of Reverie's products from Regional's warehouse in exchange for a $104,300.00 "[g]ood [f]aith [p]ayment" for the past due balance.  Docket Item 8-4 at ¶ 28; *see also* Docket Item 1-1 at 103-106 (Forbearance Agreement).  As instructed by Judge Walker during the February 14, 2020 oral argument, the parties in the Underlying Action began to "work with the insurance company to ascertain whether there is coverage for the claim, [and] [] assist the claims folks in the analysis of the amount of damages."  Docket Item 8-4 at ¶ 36; *see also* Docket Item 1-1 at 113-116.  Over the next several weeks, WAIC's claims adjuster worked with Reverie to inspect the damaged products.  Docket Item 8-4 at ¶ 37.

On May 7, 2020, Regional filed its answer in the Underlying Action and asserted counterclaims against Reverie.  Docket Item 1-1 at 121-138.  According to Regional, WAIC did not object to Regional's retained counsel or the preparation of responsive pleadings, nor did it "otherwise express concern regarding the handling of the Underlying Action."  Docket Item 8-4 at ¶ 39.  Moreover, according to Regional, WAIC had not disclaimed coverage for the Underlying Action, nor had it issued a reservation of rights letter.  *Id*. at ¶ 40.  WAIC maintains that it issued a reservation of rights letter on February 3, 2020, and partially disclaimed coverage by letter dated May 20, 2020. Docket Item 12 at ¶¶ 40 and 41.

After inspecting the damaged products, WAIC's first offer of settlement, on May 20, 2020, was $51,975.00.  Docket Item 8-4 at ¶ 41; Docket Item 1-1 at 217-221. Although WAIC acknowledged coverage, it limited recovery under the Policy to what is provided in the "Legal Liability Coverage" section, which covers Regional's legal liability

for "loss to covered property while under Regional's care, custody, and control, and that Regional is obligated to pay as a warehouse operator under a 'warehouse receipt' issued by Regional."  *Id*. at ¶ 42; *see also* Docket Item 1-1 at 217-221.

Section 9(d) of Regional's warehouse receipt issued to Reverie for each of the alleged damaged products provides:

> In the event of loss, damage or destruction to stored goods for which [Regional] is legally liable, [Reverie] declares that company's liability for damages shall be limited to the lesser of the following: (1) the actual cost to storer of replacing or reproducing the lost, damaged and/or destroyed goods together with transportation costs to [the] warehouse, (2) the fair market value of the lost, damage[d] and/or destroyed goods on the date storer is notified of loss, damage or destruction, (3) 50 times the monthly storage charge applicable to the lost, damaged, and/or destroyed goods, (4) $1.00 per pound, provided, however, that within 30 days after issuance of this warehouse receipt, storer may, upon written request increase company's liability on part of all the goods stored under this warehouse receipt, in which case an increased charge will be made based upon such increase valuation, further provided that no such request shall be valid unless made before storer has knowledge that loss, damage or destruction has occurred to the goods which are the subject of the request.

Docket Item 8-4 at ¶ 43; Docket Item 1-1 at 301.  According to Regional, based on that receipt limitation, WAIC calculated Reverie's total available recovery from Regional to be $51,975.00.  Docket Item 8-4 at ¶ 44.  Reverie rejected Regional's settlement offer*, id*. at ¶ 46, and on August 17, 2020, Reverie answered Regional's counterclaims, Docket Item 1-1 at 303-312.

After a status conference in the Underlying Action on August 10, 2020, Regional asked whether WAIC would increase its offer.  Docket Item 8-4 at ¶ 47; Docket Item 1-1 at 314-315.  In a separate letter to WAIC, Regional's counsel again demanded both a

defense and indemnification under the terms of the Policy and reminded WAIC of Regional's intent to pursue counterclaims against Reverie.  Docket Item 8-4 at ¶ 48; Docket Item 1-1 at 317-318.  WAIC responded on September 22, 2020, and partially denied Regional's request for coverage under the Policy.  Docket Item 1-1 at 320-324. In the letter, WAIC reiterated its reliance on section 9 of the warehouse receipt for the computation of its $51,975.00 offer of settlement.  *Id*.  WAIC also provided the following reasons for its partial denial of coverage:

- You retained counsel and incurred defense costs prior to notifying us of the suit which did not give [WAIC] an option for defense and is a violation of the insuring agreement and policy conditions.
- Your retention of counsel was not authorized or approved by Liberty Mutual.  You acted on this matter without consent of approval from Liberty Mutual Insurance.
- The decision to move forward with legal defense was made without input or approval from Liberty Mutual Insurance.
- We were denied our right under the policy to settle the claim without any incurred legal costs.

Docket Item 1-1 at 323.

At the conclusion of the letter, WAIC quoted "Suits Against Us" language that appears to be from a Contractors Equipment Coverage policy—that is, a policy different than the one at issue here.[2]  The parallel "Suits Against Us" provision in the Warehouse Policy at issue here provides:

---

[2] The letter included the following provision:

10. **Suits Against Us** - - No one may bring a legal action against "us" under this coverage unless:
    a. all of the "terms" of this coverage have been complied with; and
    b. the suit has been brought within two years after "you" first have knowledge of the loss.

11. **Suits Against Us** – No "suit" may be brought against "us" unless:
    a. all of the "terms" of this coverage have been complied with; and
    b. the amount of the insured's liability has been determined by:
        1) a final judgment against an insured as a result of a trial; or
        2) a written agreement by the insured; the claimant, and "us".

No person has a right under this coverage to join "us" or implead "us" in actions that are brought to determine an insured's liability.

Docket Item 1-1 at 293.

## LEGAL STANDARD

"A motion for summary judgment may be granted 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Soto v. Gaudett*, 862 F.3d 148, 157 (2d Cir. 2017) (quoting Fed. R. Civ. P. 56(a)). "Summary judgment is appropriate when 'there can be but one reasonable conclusion as to the verdict,' *i.e.*, 'it is quite clear what the truth is,' and no rational factfinder could find in favor of the nonmovant." *Id.* (first quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986), then quoting *Poller v. Columbia Broad. Sys., Inc.*, 368 U.S. 464, 467 (1962)). Conversely, "[s]ummary judgment should be denied if, when the party against whom summary judgment is sought is given the benefit of all permissible inferences and all credibility assessments, a rational factfinder could resolve all material factual issues in favor of that party." *Id.* "In deciding such a motion, the court cannot properly make credibility determinations or weigh the evidence." *Id.*

---

Docket Item 1-1 at 323-324.

**DISCUSSION**

**I.      Regional's Motion for Summary Judgment**

"In determining a dispute over insurance coverage, a court starts with the language of the policy itself."  *Am. Empire Surplus Lines Ins. Co. v. Colony Ins. Co.*, No. 16-cv-7946 (KBF), 2017 WL 4857595, at *3 (S.D.N.Y. Oct. 25, 2017), *aff'd*, 744 F.App'x. 32 (2d Cir. 2018).  When a dispute arises involving the terms of an insurance contract, New York insurance law provides that "an insurance contract is interpreted to give effect to the intent of the parties as expressed in the clear language of the contract."  *Parks Real Estate Purchasing Group v. St. Paul Fire and Marine Ins. Co.*, 472 F.3d 33, 42 (2d Cir. 2006) (quoting *Morgan Stanley Group Inc. v. New England Ins. Co.*, 225 F.3d 270, 275 (2d Cir. 2000) (internal citations omitted)).[3]

The interpretation of insurance contracts is purely a question of law for the courts, and under New York law, "insurance policies are interpreted according to general rules of contract interpretation."  *Olin Corp, v. America Home Assur. Co.*, 704 F.3d 89, 98 (2d Cir. 2012) (citing cases); *see also Alexander & Alexander Services, Inc.*

---

[3] In a diversity case such as this, the Court applies the choice of law rules of the forum state—here, New York State.  *Klaxon Co. v. Stentor Elec. Mfg. Co. Inc.*, 313 U.S. 487, 496–97 (1941).  In contract cases, New York courts apply a "center of gravity" or "grouping of contacts" approach.  *Lazard Freres & Co. v. Protective Life Ins. Co.*, 108 F.3d 1531, 1539 (2d Cir. 1997).  Among other factors, courts may consider the place of contracting, the place of negotiation, and the domicile of the contracting parties.  *See id.* Here, New York was the place of contracting and negotiation, and Regional was domiciled in New York—suggesting that New York law applies.  Moreover, the parties rely on New York law in their briefs, *see* Docket Items 8-5, 11, 20 and 21, and there has never been a dispute that New York law applies in this action.

*v. These Certain Underwriters at Lloyd's, London, England*, 136 F.3d 82, 86 (2d Cir. 1998).  Two such rules of contract interpretation are relevant to this dispute.

First, the "words and phrases [in a contract] should be given their plain meaning, and the contract should be construed so as to give full meaning and effect to all of its provisions."  *Olin Corp.*, 704 F.3d at 99 (quoting *LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195, 206 (2d Cir. 2005)).  "Any interpretation of a contract that 'has the effect of rendering at least one clause superfluous or meaningless … is not preferred and will be avoided if possible.'"  *Id*.

Second, ambiguous contract provisions are construed against the party that drafted the contract.  *Hugo Boss Fashions. Inc. v. Federal Ins. Co.*, 252 F.3d 608, 615 (2d Cir. 2001).  Contract terms are ambiguous if they are

> capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.

*Olin Corp.*, 704 F.3d at 99 (quoting *Nowak v. Ironworkers Local 6 Pension Fund*, 81 F.3d 1182, 1192 (2d Cir. 1996)).

In the insurance context, "[w]hen the provisions of the policy are unambiguous and understandable, the court is obliged to enforce them as written."  *Am. Empire Surplus,* 2017 WL 4857595, at *3; *see also Parks Real Estate*, 472 F.3d at 42.  Where a provision in an insurance policy is ambiguous, however, the ambiguity must be resolved against the insurer who drafted the policy and in favor of the insured.  *Hugo Boss Fashions,* 252 F.3d at 615.

Here, the dispute involves the defense coverage provision in "Coverage Extension 2" of the Policy.  WAIC contends that the clear language of that provision gives it the option—not the obligation—to defend the Underlying Action.  Docket Item 21 at 7-8.  For that reason, and because WAIC says that Regional cannot sue until Regional is obligated to pay a judgment, WAIC says that it is not liable for defense costs or to provide a defense for Regional.  *Id*. at 9-11.   Regional, on the other hand, says that the provision at issue is ambiguous and therefore should be read to require the insurer to pay defense costs.  Docket Item 25 at 8-10.

In its supplemental brief, Regional alerted the Court to a recent opinion from the Minnesota Court of Appeals, *Mississippi Welders Supply Co., Inc. v. Flueger Crane LLC*, No. A 19-1590, 2020 WL 2313704 (May 11, 2020), addressing a defense costs provision identical to the one at issue here.  *Id*. at 10-14.  There, the insurance company sought summary judgment, arguing that it had no duty to defend its insured because the defense costs provision expressly gave it the option to defend.  The insured cross-moved for summary judgment, arguing that the defense costs provision was ambiguous.

The Minnesota trial court concluded that the defense costs provision was indeed ambiguous because the policy did not explain under what circumstances the insurance company could exercise its option to defend a suit.  *Mississippi Welders*, 2020 WL 2313704, at *2.  On appeal to the Minnesota Court of Appeals, the insurance company argued that because the word "option is only susceptible to one interpretation," the defense costs provision was unambiguous and the insurer had an option—not an obligation—to defend.  *Id*.  The Minnesota Court of Appeals disagreed, said it would not consider the word "option" in isolation, and concluded that the defense costs provision

13

was ambiguous.  *Id*.  The court then resolved that ambiguity in favor of the insured and affirmed summary judgment in its favor.  *Id*.

After concluding that the coverage provision in the policy did not "alone . . . create the duty to defend," the court turned to the policy's "coverage extensions."  *Id*. at *3.  Coverage extension "2a states that [the insurer] has 'the option to defend any suit brought against [the insured] as a result of damage to covered property caused by a covered loss.'"  *Id*.  The court then agreed with the insurer that the word "'option' means '[t]he power or freedom to choose.'"  *Id*. (brackets in original) (citation omitted).  But the court nevertheless found that the provision was ambiguous in light of the provisions that followed.  *Id*.

For example, coverage extension "2b" provides that the insurer does not "have to provide a defense after" it has paid the policy limit "as a result of a judgment or written settlement."  *Id*.  One way to read that, the court observed, was to say that if the insurer chose to defend, it would defend only until it paid the policy limit.  *Id*.  But "[a]nother reasonable interpretation is that paragraph 2b is a more specific provision about when [the insurer] does 'not have to provide a defense.'"  *Id*.  And the court adopted the latter reading because it was more favorable to the insured.  *Id*.

This Court finds that reasoning persuasive.  Indeed, the clear implication of saying that the insurer *does not* have to provide a defense *after* the occurrence of an event is that the insurer *does* have to provide a defense *before* that event occurs.  And the language of the Policy here—indeed, the placement of that language in paragraphs "2a" and "2b" of the Policy's "coverage extensions"—is identical to that in *Mississippi Welders*.  *Compare* Docket Item 1-1 at 285 (the Policy here) *with Mississippi Welders*,

2020 WL 2313704, at *3-4.   So this Court finds that not only is the interpretation

requiring a defense here a reasonable interpretation that creates an ambiguity, but it

also is the interpretation that makes the most sense.

Indeed, if, as WAIC argues here, the "option to defend" in paragraph 2a means

that WAIC always can choose not to defend a lawsuit, then paragraph 2b would be

meaningless:  WAIC would never "have to provide a defense" regardless of whether it

paid the policy limit "as a result of a judgment or written settlement."  And because that

interpretation would render a provision of the Policy meaningless, it would violate a

basic rule of contract interpretation.  *See Olin Corp,* 704 F.3d at 99.

The *Mississippi Welders* court also noted that coverage extension 2c creates a

similar inconsistency with the option to defend in paragraph 2a.  *Mississippi Welders*,

2020 WL 2313704, at *3.  Paragraph 2c requires the insured to obtain the insurer's

written consent before the insured may "admit liability for a loss, settle a claim, or incur

expense."  *Id.*  The court reasoned that if the insured must obtain the insurer's "written

consent to pursue a defense," then the insurer "is controlling the defense, which is

inconsistent with reading the 'option to defend as giving [the insurer] the choice to

refuse to defend."  *Id.*  In other words, the court found that if the insurer "controls the

defense then it has the duty to defend its insured."  *Id.*  And the same language in the

Policy here leads to that same conclusion.

Finally, the *Mississippi Welders* court noted that paragraph 2d lists the covered

expenses the insurer will pay in connection with any suit it defends and, read together

with paragraphs 2b and 2c, is subject to multiple interpretations.  For example, because

it does not refer to the coverage limit to which paragraph 2b refers, the insurer might

well be required to pay to pay "costs associated with any suit we defend" even after the coverage limit has been reached and beyond coverage that has been exhausted. For that reason as well, the court found an ambiguity that it resolved in favor of the insured.

This Court agrees with the Minnesota Court of Appeals. For all the reasons stated in *Mississippi Welders,* but especially because of the ambiguity created by paragraph 2b's provision defining when WAIC does not "have to provide a defense," this Court finds that the defendant is required to defend here.

This is not a case like those cited by the defendant in support of its argument: none of the policies in the cases WAIC cites have provisions like those in the policy here. Those cases involved policies giving the insurer "the 'right,' at its 'option' to provide a legal defense," *Transcontinental Rigging and Loading Corp. v. Great American Ins. Co.*, 106 F.3d 409 (9th Cir. 1997), or "the right at its sole option to defend," *B & D Appraisals v. Gaudette Machinery Movers, Inc.*, 752 F.Supp. 554 (D.R.I. 1990). Those cased involved policies that did not have the language in coverage extensions 2c, 2d, and especially 2b that create the ambiguity here. And for those reasons, the cases WAIC cites are inapposite.

WAIC maintains that Regional's motion for summary judgement is premature because the parties have not engaged in discovery. But as discussed above, an insurer's duty to defend is determined by the terms of the policy and where, as here, the terms of the policy are ambiguous, any ambiguity is resolved in favor of the insured. *Hugo Boss*, 252 F.3d at 615. Discovery will not change that, nor will it change the contractual interpretation that this Court shares with the Minnesota Court of Appeals.

In sum, this Court agrees with the logical and persuasive analysis in *Mississippi Welders* and finds that the ambiguities highlighted in that case apply to the identical policy language here.  This Court resolves those ambiguities in favor of the insured, and Regional's motion for summary judgment is therefore granted.

## II.    WAIC's Motion to Dismiss

WAIC argues that the complaint must be dismissed because Regional failed to comply with the "Suits Against Us" provision in the Policy, Docket Item 1-1 at 293.  *See* Docket Items 11, 20 and 25.  But the same ambiguity noted above precludes WAIC's argument.  In other words, because WAIC must provide a defense, the "Suits Against Us" provision must be limited to suits for indemnification, not for failure to provide a defense; otherwise, WAIC's obligation to defend could never be enforced by an insured. And that would render the obligation to provide a defense meaningless.  *Cf. Olin Corp,* 704 F.3d at 99 ("Any interpretation of a contract that 'has the effect of rendering at least one clause superfluous or meaningless … is not preferred and will be avoided if possible.'").

Therefore, having concluded that the defense costs provisions in the Policy are ambiguous and having awarded summary judgment to Regional on the issue of WAIC's obligation to defend, this Court denies WAIC's motion to dismiss.[4]

---

[4] Regional gave WAIC formal, written notice of the lawsuit about three weeks after it was filed, Docket Item 8-4 at ¶ 31; Docket Item 12 at ¶ 31, and Regional maintains that it gave WAIC notice of the dispute "from the beginning," *see* Docket Item 8-4 at ¶ 31.  WAIC disputes the latter assertion, *see* Docket Item 12 at ¶ 31, but there is no real question that Regional met the notice provisions of the Policy.  In fact, WAIC does not argue otherwise in support of its motion or in opposition to Regional's motion. *See* Docket Items 11, 21, and 25.

## CONCLUSION

For the foregoing reasons, Regional's motion for summary judgment, Docket Item 8, is granted.[5]  For the same reasons, WAIC's motion to dismiss, Docket Item 9, is denied.  The Clerk of Court shall enter judgment in favor of Regional and close this case.

SO ORDERED.

Dated:       March 28, 2023
             Buffalo, New York

<em>s/ Lawrence J. Vilardo</em>
LAWRENCE J. VILARDO
UNITED STATES DISTRICT JUDGE

---

[5] WAIC apparently takes issue with Regional's having hired counsel on its own and the attorney fees charged by that counsel.  This Court does not opine about what fees were incurred in connection with the Underlying Action and when they were incurred, exactly what fees and costs WAIC is bound to pay, whether any fees are reasonable, or any similar issue.  Rather, this Court's decision is limited to deciding that WAIC has an obligation to provide Regional a defense in connection with the Underlying Action.